ACCEPTED
15-24-00095-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/14/2025 12:00 AM
CHRISTOPHER A. PRINE
CLERK

# Wolfgang P. Hirczy de Mino, PhD

wphdmphd@gmail.com

Amicus Curiae

April 6, 2025

RECEIVED IN
15th COURT OF APPEALS
AUSTIN, TEXAS

4/14/2025 12:00:00 AM
CHRISTOPHER A. PRINE
Clerk

Case No: 15-24-00095-CV
Case Style: Edward R. Turnbull, IV v. Commission for Lawyer Discipline (CFLD)

## The Commission's Failure to Police Sex Scandal Mongering

Dear Mr. Prine:

I am writing to bring to the Court's attention a serious problem with the Commission for Lawyer Discipline ("the Commission" of "CFLD") that overlaps with the rather unpleasant subject-matter of the allegations and counter-allegations among attorneys in this case: The Commission relies on dirty work done by Texas attorneys acting as vigilantes, who are not formally under the Commission's control, are not accountable to it, and engage in egregiously wrongful behavior under the protective cover of attorney immunity. The Commission then relies on their tainted handiwork and magnifies the harm and injustice already visited upon fellow Texas attorneys by profit-driven vigilantes.

In theory, the Commission can take action against them. In practice, it fails to do so, as will be shown in the textbook-worthy case discussed below. The Commission fails to hold such vigilante attorneys accountable for the misconduct they engage in while they prey upon fellow Texas attorneys in pursuit of revenue in the form of monetary sanctions; sanctions that are predicated upon rule violations by other attorneys that the vigilantes themselves play an active role in developing in the hope of cashing in on them.

One of the despicable practices the Commission apparently condones tacitly, if not actively, is sex scandal mongering for tactical litigation advantage and monetary gain. More specifically, attorney-on-attorney sex scandal mongering, for which ordinary civil remedies are not available because the Texas Supreme Court has seen fit to shield the offending lawyers from tort claims by non-clients.[1]

Because there are no negative repercussions or consequences, and because the Commission fails to restrain the purveyors of salacious insinuations and allegations against fellow attorneys, anything goes, and any opposing counsel is fair game. Or so it appears. The reprehensible

---

[1] *See Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481, 484-86 (Tex. 2015) and *Landry's Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 47 (Tex. 2021)(proclaiming that attorney immunity is "comprehensive affirmative defense protecting attorneys from liability to non-clients" such that "otherwise wrongful conduct" by attorney "is not actionable if it is part of the discharge of the lawyer's duties in representing his or her client." (internal quotations omitted)). Beyond just attorneys, the judicial proceedings privilege is an absolute privilege that covers any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case. *Id.,* at 47.

scheme is particularly tempting when the opposing party does not have much money, but her attorney has a good revenue stream or assets of which he or she can be stripped.

The paradigmatic case that exemplifies these problems arose in the Harris County Family Law Center during the COVID pandemic and then metastasized into a two additional proceedings in the Civil Trial Division along with multiple appeals and mandamus petitions in the First Court of Appeals, and further appellate activity in the Texas Supreme Court. The total tally comprises three trial court cases and 6 or 7 appellate proceedings.[2] Several of the appellate cases still remain pending post-judgment in the First Court of Appeals.

### Attorney-on-Attorney Sex (Scandal) Abuse

In family court, the Vigilante Attorneys represented well-heeled clients in a contested child custody matter against the Mother of two minor children who had already gone through several attorneys and had depleted her resources. The Mother was herself an attorney ("Attorney Mother" " or "Molly")[3] but didn't practice family law. Molly managed to get a fifth attorney ("Attorney Frank" or "Frank") to help her for free because they worked together at the same law firm and had a personal, not just a professional, relationship. Attorney Mother and Attorney Frank also represented clients jointly and were both bound by client confidences.[4] It appears they also acted as attorneys for each other at least to some extent, adding a formal fiduciary duty to their interpersonal relationship, assuming that their personal relationship with each other had not already given rise to a fiduciary one.[5]

Displeased with the fact that Attorney-Mother was able to stand up to them because she now had able and zealous representation for which she didn't have to pay, the Vigilante Attorneys set out to destroy the relationship between her and her "pro bono" attorney and for good measure caused her to lose her job and her accommodations as well.

They did so by filing a motion in the First Court of Appeals to embarrass Mother by insinuating that she was sleeping with her attorney, while disclaiming any definitive knowledge thereof (using an "if true" qualification).[6] They nevertheless intimated in their show-authority and sanctions motion, that they had reason to believe that something sexual was in play based on a vague reference to the services to a private investigator. This raises a serious question all by itself: Should attorneys be free to retain private investigators to pry into the private affairs, not to mention the sex life, of opposing counsel in a pending case? This is an important attorney ethics question and a matter that might call for some rule revisions. But let's reserve judgment for now and examine the particulars of the case.

---

[2] This does not include peripheral criminal and protective order litigation.

[3] A pseudonym.

[4] The joint law firm affiliation can be ascertained by searching Harris County District Court records by attorney name or SBOT number.

[5] The three female justices on the Texas Supreme Court and one male colleague recently disapproved of the recognition of informal fiduciary relationship, but their views did not carry the day. *See Pitts v. Rivas*, No. 23-0427 (Tex. Feb. 21, 2025)(majority op. by Chief Justice Backlock; concurrence by Justice Huddle).

[6] The motion was patterned on rule 12 of the trial court rules of procedure. Tex. R. Civ. P. 12.

### Family Court Litigation and Protection of Privacy

In Texas, fault grounds, most notably adultery, may be pleaded and proven up in a divorce case, and may give one side leverage for a community property division in the "wronged" spouse's favor, whether through skilled out-of-court bargaining or a judicial decision or jury verdict following a trial. Because of this, private investigators may have a role to play in some matrimonial dissolution proceedings.

But the case in question was a suit affecting the parent-child relationship (SAPCR) only, so spousal straying was not an issue. Indeed, the two children in whose interest the litigation was conducted were themselves the fruit of nonmarital conception, giving neither parent the moral high ground on that score.[7]

Note further that adultery is no longer a crime in Texas, and that nonmarital sexual intercourse by consenting adults is no crime either. For what it's worth, *deviant* sexual intercourse (in Texas penal code language) even has U.S. supreme court protection.[8] Love is love, we are told, except for heterosexuals in the male-female configuration, especially when a power differential is detectible. Think attorneys: Let's say they both graduate at about the same time from the South Texas College of Law. A few years down the road one has a successful practice, the other does not. She then joins his law firm as an associate and they do criminal and personal injury law together. Perhaps they became lovers. But that wasn't suggested. What the Vigilante Attorneys honed in on in their appellate filings and figurative floggings on the public pillory was attorney-client sex, and the professional frowning and opprobrium that such framing predictably entailed.[9]

The fact that matrimonial and child custody litigation involves sensitive private and often embarrassing matters is the reason why family court filings are excepted from the presumption of openness to the public under rule 76a.[10] For the same reason they are not accessible to the general public through the Harris County District Clerk's website, which is not true of cases in the Civil Division. The family court dockets can be looked up, but all PDF links are marked "restricted."

Even though the child custody dispute arose from a nonmarital relationship that had deteriorated, the Vigilante Attorneys, representing Father and paternal Grandfather, nevertheless made Mother's alleged nonmarital relationship an issue in the pending appeal, causing a conflagration that culminated in the Mother taking herself out of the picture for good.

Before we get into the thicket, one point deserves emphasis: At the time the Father's attorneys filed the motion containing their sex allegation against Attorney-Mother and Frank, her attorney, the case was already on appeal. Even though the court of appeals cannot hear evidence,

---

[7] For whatever reason, the Father had initially brought the case as divorce-with-children, possibly to avoid having to establish his status as a presumed father of the minors otherwise and gain a tactical advantage as the petitioner. The parents later stipulated that there was no marriage, formal or informal.

[8] *But see* Tex. Const. art. 1, § 32 and Tex. Fam. Code § 6.204(b) (West 2003) (defining marriage as the union of one man and one woman and declaring same-sex marriage void).

[9] The Commission would later refer to Molloy as Frank's girlfriend.

[10] Another reason may be that confidential documents, such as tax returns, and confidential person-specific information such as birth dates, addresses, and social security and TDL numbers are material to determinations of child support and administrative enforcement thereof.

the Vigilante Attorneys filed their sex scandal motion (titled "Motion to Show Authority") in the court of appeals, making it accessible to the entire world. In flagrant violation of the appellate rules, they did not even redact the names of the minors. For good measure, they asked for Mother's attorney to be sanctioned, thus revealing another underlying ulterior motive.

### Words chosen with malice to besmirch the opposing party and her attorney

In the family law context, adulterous lovers are often referred to as *paramours*, an antiquated term that basically functions as a polite euphemism. More generally, the labels used to refer to heterosexual relationships between unmarried partners are "romantic relationship", "dating relationship", or "personal relationship"; sometimes also boyfriend-girlfriend relationship, though that usage is more common for and among young people.

In the case offered as a paradigmatic scenario here, the Vigilante Attorneys didn't refer to the suspected personal relationship between Attorney Mother and Attorney Frank as *romantic* or even as *intimate*. No. They deliberately used the term *sexual* to refer to their relationship to be as crass as they could and to maximize the detrimental impact of the insinuation, while at the same time averring that they had no personal knowledge that their insinuation was actually true.[11] They meekly averred that they felt "uncomfortable" about it.[12] Which is to say, their own speculation. They then urged the appellate court to remand the matter to the family trial court for fact-finding about what was going on between opposing party and opposing attorney.

Even assuming that they had viewed graphic surveillance footage of sexual intercourse of their litigation opponents or other intimacies, would that justify them sharing it with the world? Out of spite, or for litigation leverage? To make money off the purported sanctions under some sanctions rule? On the appellate court's website no less?

Notwithstanding their express disclaimers as to veracity, these attorneys nevertheless purported to know one critical detail about the alleged sexual relationship that they said they really knew nothing about:[13] That Attorney Frank (rather than Attorney Mother) had initiated it,[14] and that he was taking advantage of his client;[15] in other words: that the suspected sex (if any, since they disavowed being privy to anything for sure) was of a nature where Attorney Frank was the dominant actor and Attorney Mother the submissive one. Even more incredibly, that Frank was exerting undue control over her by letting her live in a house that he owned, impliedly for free.

Unlike the Commission later in its disciplinary petition, they did not suggest that maybe Attorney Mother was Attorney Frank's girlfriend. No, it had to be about sex. Consenting adults just having a nonmarital relationship is too mundane. That alone won't do for a scandal. An alleged lack of consent based on a "power differential" would come in handy under the prevailing zeitgeist.

---

[11] In its disciplinary petition against Attorney Frank, the Commission would later refer to her as his *girlfriend*.
[12] "Appellees are in the uncomfortable position of currently having no basis to personally vouch whether these incredibly disturbing allegation are true." Sex/Show/Sanctions Motion, p.
[13] They used a "if true" qualification in peddling their insinuations, and professed outrage ("disturbing").
[14] "Appellees have information and belief through investigative sources to suggest that [Frank] has also instigated a sexual relationship with [Molly]." Sex/Show/Sanctions Motion, p. 4.
[15] "[...] an over-reaching member of the bar who has taken advantage of this client [...], Sex/Show Motion, p. 2.

The Vigilante Attorneys insinuated that Frank was the aggressor and that Attorney-Mother was being taken advantage of. How could they know? What gives them the right to even speculate and reach such conclusions, then publicize them? Apparently they inferred that state of relations, true to gender-feminist dogma, - now vulgarized and widespread - from a structural power differential between Attorney Mother and Attorney Frank. Frank had his own law firm (or at least co-owned it with a partner, suggested by name and type, PLLC) and Molly was an associate, no doubt by mutual assent and probably under the at-will doctrine. If not, an employment agreement would control and the Vigilante Attorney wouldn't be a party to it.

While operating in the gender-feminist haze of the zeitgeist, the Vigilante Attorneys put forth these dominance-submission fantasies based on zero evidence. They endeavored to label these hetero-normal oppression fantasies as "incredibly disturbing" and urged them as compelling reason to halt the ongoing SAPCR appeal and send it back to the family court judge for further probing; for an investigation of the intertwined personal and professional relationship between Attorney Mother and Attorney Frank. The First Court of Appeals, as constituted in 2020, obliged: In denigration of the two attorneys' shared and reciprocal common-law right to privacy and – arguably – their *constitutional* right to privacy as well, assuming that both were unmarried at the time and adulterous consortium was therefore an impossibility.

Even assuming *arguendo* that Attorney Frank, unlike Attorney Mother, was married at the time, the insinuation of sexual relations with another person is probably *defamatory per se*. There is no question that it would be for an allegation of rape or other sex crime, or a violation of Title VII in the form of sexual harassment, to the extent the Vigilante Attorneys' sexual innuendo and scandal mongering on appeal are interpreted as such by a reasonable person reading their allegations.

But even if the Vigilante Attorneys did possess specific evidence of sexual acts performed by Frank on Molly, or Molly on Frank, or vice versa, or contemporaneously and reciprocally, what could possibly justify them publishing references to it gratuitously on the First Court of Appeal's website for the whole world to see? How would that not constitute an egregious violation of their privacy rights, albeit one for which there is no remedy in tort thanks to the Texas Supreme Court's promulgation of common-law attorney immunity against tort claims by nonclients?

This sorry state of legal affairs in the otherwise great state of Texas – the blanket exemption of Texas attorney from tort liability predicated upon litigation activities performed on behalf of a client -- makes it all the more important that the appellate courts exercise their authority to curb the excesses invited by such a regime of impunity. Alas, the First Court of Appeals as constituted prior to 2025 failed miserably in upholding common standards of decency when they acceded to the Vigilante Attorneys demands for a sex & male-female imbalance and consent inquisition to be conducted by the Harris County Family District Court judge.

They remanded for fact finding under the rubric of an alleged conflict of interest and alleged deficiency or malpractice by Attorney Frank in his representation of Attorney Mother. And they authorized this even though Attorney Mother had herself executed an affidavit disavowing certain inconsistent statements [about her relationship with Attorney Powell and his authority to act as her attorney] that she "may have made" while not under oath. Mother obviously didn't want to stipulate that the letter and text messages attributed to her were authentic, or that she had lied in private communications to the opposing parties with whom she was trying to make amends for her own good

reasons: to facilitate access to the children despite the negatives in her record that had led to her parental rights being curbed and conditioned in the first place.

[Embed image of Mother's affidavit her]

In their vicious public assault on Attorneys Molly (opposing party) and Frank (her opposing counsel) in the court of appeals, the Vigilante Attorneys feigned concern for Mother's wellbeing while being engaged as attorneys for and being paid by the opposing party (Father and Grandfather) and vigorously pursuing those parties' agenda.[16] What was that agenda? There is no dispute about it. They wanted to shut down the appeal since they had already achieved what they considered a favorable outcome in the trial court, which included supervised visitation for the Mother and other limitations on her parenting along with payment of child support from Mother to Father.

### The Vigilantes' Sex Inquisition Motion was hostile and should not only have been denied, but struck as impertinent

It is not necessary to know whether Attorney Mother and Attorney Frank ever had sex, how often, or what kind of sex. There should never have been any remand for such an inquisition because (1) the sex stuff was brought up and mongered to the court of appeals by interested parties and their attorneys to cause embarrassment and gain an advantage in litigation; (2) the Vigilante Attorneys did not possess standing to intrude on the attorney-client relationship or any other relationship, not to mention standing to advance legal-mal claims or employment grievances on behalf of Molly, the opposing party; (3) the type of motion they brought was not even authorized by the appellate rules and had sensitive confidential material attached, and (4), the motion challenging Attorney Frank was motivated by the desire to realize pecuniary gain in addition to strengthening the scandal mongers' litigation position in the family law matter. The primary objective of the motion was not even disguised: it was to force the opposing party's attorney to bow out, leaving Mother to fend for herself.

The concoction of a sex scandal and resultant judicial inquest would predictably generate a aspersions and conflict, allowing the Vigilante Attorneys to separate Mother from her attorney without even having to meet the stringent requirements of a motion to disqualify opposing counsel.

When they filed their motion in the appellate court, it was already clear that the Mother had been lying in private communications.[17] It was therefore inevitable that Attorney Frank's truthful testimony on the same matters would be compromising to her as her client, forcing him to step aside for that reason alone (regardless of any other reasons) because his role as advocate and material witness would be incompatible.

Notwithstanding all these red flags, and notwithstanding their awareness that Mother herself was an attorney and would know the difference between lying when under oath and when not, the Court of Appeals as constituted in 2020 bought the Vigilante Attorney's story, based on allegations and unauthenticated documents that weren't in the appellate record, and granted the Vigilante Attorney's motion. They allowed the Vigilante Attorneys to, in effect, impeach a sworn affidavit by

---

[16] According to Attorney Powell, the Grandfather did not possess standing to intervene in the SAPCR, and should not therefore qualify as a party to the case.

[17] The show-authority ad sanctions motion itself lays out the Mother's inconsistent statements.

Mother with unauthenticated copies of private communications that where not meant to be disclosed to the court, not to mention the whole world on an appellate court's website.

The family court judge below then conducted the inquisition into the relationship of Mother and Attorney Frank and it didn't end well for either one of them. The extensive record of what happened in the family district court on limited remand is not available to the public. See reference to privacy restrictions *supra*. Suffice it to point out that there was a conflagration: The Mother committed suicide (verified by death certificate) and Attorney Frank was made the fall guy. He was found "guilty" of a power differential vis-à-vis Mother and was severely sanctioned for allegedly having litigated on behalf of Mother without Mother's consent even though Mother has executed an affidavit attesting that Frank was representing her and was acting with authority to do so.

In essence, Frank was made the bad guy – nay, an *evil* one - for having done an enormous amount of legal work for Mother without apparently ever getting a penny for it.

For good measure, the Commission prosecuted Attorney Frank, who is now disbarred for having done all that work for Molly "in bad faith" and for other implausible offenses, such as disclosing that Mother had prescription drug abuse problems of which everybody was already aware anyhow.

He was also condemned for trying to get her help in the form of an ad litem attorney that would look out for her best interest. According to the Commission's disciplinary petition,[18] the trial court found that Mother never consented to legal representation by Attorney Frank, even though she had executed a sworn and notarized statement to the contrary, a copy of which the Vigilante Attorneys themselves had filed in the First Court of Appeals as one of the exhibits attached to their amended motion to show authority.

---

[18] Original Disciplinary Petition filed in Harris County District Court September 3, 2021, Cause No. 2021-56827.



**FACTUAL BACKGROUND**

1. Respondent, Frank ████████ became involved in the custody matter of ████████ ██████ (hereinafter referred to as "██████") on or about March 21, 2019. ██████ is Respondent's ex-girlfriend and former employee. At the time, the parties had entered into a Mediated Settlement Agreement (MSA) and ██████ was represented by two other attorneys. The case was later appealed to the First Court of Appeals.

2. In July and August of 2020, the Trial Court heard opposing counsel's motion for Respondent to show authority and sanctions after the First Court of Appeals abated and remanded the case back to determine if Respondent had authority to represent ██████ in the custody matter. On or about September 3, 2020, the Trial Court found that ██████ never

Original Disciplinary Petition – [POWELL]
Page 2 of 5

consented to Respondent's representation and she had been manipulated by Respondent. The Trial Court also found that Respondent pushed the litigation, filed pleadings, and sought an appeal despite ██████ objections. ██████ subsequently committed suicide.

3. The findings of the Trial Court indicated that Respondent was unable to provide any documentation or testimony to show Respondent had authority to take these actions and Respondent was sanctioned approximately $490k.

The Vigilante Attorneys, by contrast, got off not only with impunity, but walked away with judgments for attorney's fees and sanctions "awards" in their favor. They got to profit from their reprehensible litigation conduct and from the invocation of attorney immunity against Attorney Frank, who sought to hold them accountable in tort in a subsequent lawsuit. A futile endeavor, as it turned out. And a costly one for him too. Even more in shifted attorney's fees and sanctions for defending himself and seeking justice for the indignities and abuse that had been visited upon him by the attorneys on the other side.

### The Perils of Pro Bono: Work for Free. Be a Sucker. Be Damned

The challenged attorney's real "crime" may well have been this: He agreed to represent his fellow attorney and girlfriend in her child custody fight without charging her. Even though they Vigilante Attorneys insinuated that Frank was doing the legal work in exchange for sex, they actually

used the term "pro bono" and did so as if it were an insult.[19] They castigated Attorney Frank for his "pro bono" work. What is the message here? – The message is that no good deed must be allowed to go unpunished. And that you may be toast as an attorney if you perform legal work for a loved one.

The Vigilante Attorneys were high-octane and high-dollar-per-hour lawfare professionals who resented that their opponent was getting legal help for free on account of her relationship with another attorney, and that she was thus in a position to even the scales in a lopsided custody dispute where one side had the means to out-spend and out-gun the other. To them, the free legal help Powell provided to Mother amounted to improper leverage. Improper because she wasn't paying for it, but was getting leverage that she wouldn't otherwise have had to stand up to them.

So, in order to have their way, and make her squeal uncle and beg for mercy, they set out to destroy the Mother's relationship with her attorney by engineering a sex and dominance-submission scandal on appeal and with it drive a wedge between those two. Alas, their sinister strategy was successful. They succeeded in destroying both the opposing party (Attorney Mother, who committed suicide) and opposing counsel (Attorney Frank, who was disgraced, fined nearly half a million dollars or so by way of sanctions, and disbarred).

Not only did the Vigilante Attorneys get off scot-free, they profited from the fiasco they created with their unseemly sex-scandal motion to deprive Attorney Mother of legal representation that she sorely needed and forced her into a corner from which there would be no escape. The Commission then proceeded to prosecute Attorney Frank using the dirt aggregated by the Vigilante Attorneys while the latter got the last laugh and sneer. All the way to the bank.

### What the Commission Did Wrong

The bottom line here is simple: The Commission prosecuted and disbarred the wrong guy.

But even assuming that I am mistaken, and that Attorney Frank is indeed the scoundrel that multiple self-contradictory appellate opinions have since made him out to be, the Commission should have prosecuted the Vigilante Attorneys also. They are the ones that chose to engineer an attorney-client sex scandal, filed confidential material in the court of appeals to sabotage the opposing party's relationship with her attorney (who, according to the Commission's very own post-mortem pleading, had been her boyfriend), and didn't even bother to redact the names of the minors from the improperly filed and unauthenticated exhibits attached to the show-authority and sanctions motion.

They are the ones that instigated state-sponsored intrusion into seclusion and private affairs of two other attorneys and did so to scorn and debilitate them in pending litigation. They endeavored to force the Mother's attorney out to the game and cut her off from her primary support system. No wonder she found herself in a dire situation and ended up putting a bullet in her head. This may not have been inevitable (and doesn't excuse her vis-à-vis her children, whom she thereby abandoned a second time and half-orphaned) but in terms of the causal chain leading to it, there is no mystery: It all traces back to the Vigilante Attorney's filing of the fateful sex/show-authority & sanctions motion in the court of appeals. In the *but-for* sort of way. Without that motion, there would have been no

---

[19] Sex/Show/Sanctions Motion, p. 2.

remand for a trial court inquisition into her love life and her relationship with Attorney Frank, and the resultant bitter and blood-splattered end.

The Vigilante Attorneys can also take credit for demonstrating how going after fellow attorneys with sex allegations can be a highly effective litigation strategy that allows the merits of the legal issue in a custody case (here one with complex grandparent intervention issues) to be eschewed. They have provided the legal profession with a CLE-worthy game plan of how pro-bono "wretches" can be denigrated for driving up attorney's fees,[20] and how they can be stripped of their privacy, dignity, law license, and – most importantly - their assets.

This is no longer just about civility in the legal profession and ostentatious handwringing and pious articles in the Texas Bar Journal about attorney stress and mental health. What we are dealing with here is throat-cutting and cannibalism. It's dog eat dog. The fare may not be nutritious, but what matters is the end is the fattening of the bottom line.

### A New and Lucrative Practice Niche: Fleecing and Liquidating Other Texas Attorneys

Going after opposing counsel with allegations of ethics violations and seeking monetary sanctions for such violations is now a new practice niche and a profitable one at that. That's what the Vigilante Attorneys did here, and that's why I am calling them vigilantes. They were not acting on behalf of the CFLD. They were not deputized by the CFLD. They took matters into their own hands to obtain a litigation advantage for their clients and fill their pockets in the process. One attorney on the other side perished, another one is an attorney no more, but has dollar judgments in the six or seven figure range against him, though one million that was "awarded" to a nonparty was recently deleted on appeal. But that is of no moment to the Vigilante Attorneys. They came out on top. Their respective bounties were affirmed.

Even though the Commission had ready access to the evidence to the electronic trail of the Vigilante Attorneys' outrageous conduct,[21] their pernicious bid to subdue the Mother by publicly shaming her for sleeping with her attorney (who was her boyfriend, according to the Commission), they did not go after these vigilantes to hold them accountable. Rather than acknowledging how much work Attorney Frank had done for Molly *pro bono*, they condemned him for being more successful than Molly. Attorney Frank was found guilty of a power differential with respect to her, echoing the sentiments of the trial court judge, who herself much better exemplified a much more ominous power differential: The power to deprive Attorney Frank of half a million dollars by stroke of a pen for purported "bad faith" in the way he litigated. All of which just goes to show that the Commission does not perform its role of disciplining attorneys evenhandedly, and that the power of trial judges to sanction knows no bounds and can be egregiously abused.

But even if this Court is not convinced that the more sympathetic treatment of Attorney Frank in this account of what transpired in Houston (based on only limited access to appellate filings) is closer to the truth, there is nevertheless a stark lesson here. It is found in the First Court of Appeals'

---

[20] This is a rather pernicious argument because the false premise is that there are no costs on the part of the pro bono attorney, how obviously cannot earn money from other legal work devoting an enormous amount of time to the pro bono client.

[21] The sex/show/sanctions motion and much more is posted on the appellate court website. But in addition, the Commission also requested the appellate record.

opinion in Frank's failed lawsuit against the Vigilante Attorneys, who set out to destroy him. And it is this: Thanks to the broad and categorical attorney immunity bestowed by the Texas Supreme Court upon what used to be called a noble profession, the tort system provides no remedy against wayward conduct by Texas lawyers. Much rather, the prevailing regime enables, encourages, and rewards flagrant abuses.

Instead of a chance at vindication, anyone who would dare seek justice in civil court against abusive Texas attorneys faces the prospect of being severely punished. Ditto with complaints about judicial shenanigans or ineptitude by family court judges. To maintain the veneer that everything is fine and sparkling at the Family Law Center in Downtown Houston, any detractors of the ilk of Attorney Frank must be crushed and serve as a deterrent to others. An example must be made of those who would use their right to petition to challenge the status quo, and all the faults, warts, the bungling, and the inefficiencies associated with it. Airing of criticism must not be allowed, lest it engender a change for the better, or – *God forbid* - the replacement of a sitting judge in the next primary under an ethics cloud.[22] Unlikely as that scenario may be, given the well political realities and voting patterns in large metropolitan counties.

The unavailability of legal recourse against wayward Texas attorneys makes it all the more important for the Commission for Lawyer Discipline to do its job properly, rather than playing favorites or implementing an ideological or partisan agenda through selective prosecution.

In this important mission to elevate the standards of practice, and hold evil-doers accountable, the Commission has failed. Something needs to be done about it.

Respectfully submitted,

/s/ Wolfgang Hirczy de Mino

WOLFGANG P. HIRCZY DE MINO

wphdmphd@gmail.com

Member of the Attentive Public

Amicus Curiae

---

[22] *Cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 457 (2015) ("States have a compelling interest in preserving public confidence in their judiciaries.").

## AMICUS CERTIFICATE

This writer counts himself a member of another learned profession, noble of otherwise, subject to academic credentialing rather than licensing: Political Science, though he is now retired and no longer academically institutionalized.

He hereby certifies that he speaks only for himself and that he has not been paid or commissioned to pen this amicus contribution in the roman à clef tradition.

He offers it as a friend of the court and as a denizen interested in the uplifting of the legal profession and the judicial system as a whole in Texas.

The writer further certifies that he is e-serving the parties to this litigation through their respective attorneys of record at the same time he endeavors to e-files this amicus on April12, 2025.

/s/ Wolfgang Hirczy de Mino

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99599697
Filing Code Description: Other Brief
Filing Description: Amicus Brief on Failure of CFLD to Police Sex-Scandal Mongering by Texas Attorneys
Status as of 4/14/2025 7:12 AM CST

Associated Case Party: EdwardRandolphTurnbull

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Billy SHart | | billy.hart@westwebblaw.com | 4/12/2025 12:30:24 PM | SENT |
| Jay Rudinger | | jay.rudinger@westwebblaw.com | 4/12/2025 12:30:24 PM | SENT |
| Judd Stone | 24076720 | Judd@stonehilton.com | 4/12/2025 12:30:24 PM | SENT |
| Gaines West | | gaines.west@westwebblaw.com | 4/12/2025 12:30:24 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Pat Mizell | | pmizell@velaw.com | 4/12/2025 12:30:24 PM | SENT |
| David Kitner | 11541500 | dkitner@clarkhill.com | 4/12/2025 12:30:24 PM | SENT |
| Jadd Masso | 24041411 | jmasso@clarkhill.com | 4/12/2025 12:30:24 PM | SENT |
| Royce Lemoine | 24026421 | royce.lemoine@texasbar.com | 4/12/2025 12:30:24 PM | SENT |
| Richard Huntpalmer | 24097857 | Richard.Huntpalmer@texasbar.com | 4/12/2025 12:30:24 PM | SENT |
| Gaines West | 21197500 | gaines.west@westwebb.law | 4/12/2025 12:30:24 PM | SENT |
| John Rudinger | 24067852 | jay.rudinger@westwebblaw.com | 4/12/2025 12:30:24 PM | SENT |
| Daniel Olds | 24088152 | dolds@clarkhill.com | 4/12/2025 12:30:24 PM | SENT |
| Brooke Noble | | bnoble@velaw.com | 4/12/2025 12:30:24 PM | SENT |
| Michael Graham | 24113581 | Michael.Graham@TEXASBAR.COM | 4/12/2025 12:30:24 PM | SENT |
| Emily Bamesberger | | ebamesberger@velaw.com | 4/12/2025 12:30:24 PM | SENT |
| Justin B.Cox | | jbcox@clarkhill.com | 4/12/2025 12:30:24 PM | SENT |